UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

OSPREY UNDERWRITING AGENCY, LTD., for
and on behalf of certain underwriters at
LLOYD'S OF LONDON, CROWN POINT HOLDINGS, LLC,
JOSEPH A. DARDAR, Individually, and
C&J OF CROWN POINT, LLC,

        Plaintiffs,

vs.                                      Civil Action No. 2:13cv00211
                                          c/w 2:13cv-05792

M/V NATURES WAY COMMANDER,        c/w 2:13cv-05905
her engines, tackle, appurtenances, etc., *in rem*,    (pertains to 2:13cv-00211
and NATURES WAY MARINE, LLC, *in personam*,    and 2:13cv-05792)

        Defendants.

## POST TRIAL MEMORANDA

**COMES NOW** onto the Court, the undersigned counsel, Frank J. Dantone, on behalf of M/V NATURES WAY COMMANDER and Natures Way Marine, LLC, who in accordance with this Court's notice, submits this post trial memoranda.

### Facts as Asserted by Dardars

1.     The M/V PORT GIBSON is a typical Inland Rivers push boat measuring 65' 3" long x 20' 2" wide x 9' 6" in depth.  It has a three level cabin and was built in 1963.  See Exhibit 42, Mark Shiffer survey.  The M/V PORT GIBSON is 108 gross tons.  Direct Examination, Arnold Lachmann.  Please find attached a side view diagram of the hull attached as Exhibit "A," which based on the testimony, shows on the draft as testified to by Joe Dardar, of 5' 6" and the engine room deck at approximately 2 ft., with approximately 2 ft. of bilge.  The diagram also shows the approximate location of the puncture, which was located approximately 2 ½ ft. from the baseline, and the diagram also shows the location of the hatch.

2.       Chad Dardar re-packed the packing glands a week to ten days before the sinking.  The packing glands are in an area which would allow entry of water into the vessel.  Chad Dardar TR, pp. 27-28 (hereinafter "C. Dardar TR, p.(p.) _____").

3.       It is the contention and testimony of the Dardars: Joe, his nephew, Chad, and his sister, Shannon, that three vessels broke away from their mooring bouncing up and down as a result of the wheelwash of the M/V NATURES WAY COMMANDER (hereinafter "COMMANDER"); that the M/V PORT GIBSON was faced up to the Dredge BUCCANEER, and the M/V DAWN STARR was attached to the M/V PORT GIBSON on the starboard side, and that the three vessels drifted 50 to 60 ft. straight across the slip to a soft marshy mud bank, and within a short period of time, the vessels were re-moored back in their original position.  Joe Dardar TR, pp. 15-16; 26 (hereinafter "J. Dardar TR, p.(p.)_____"); and C. Dardar TR, pp. 7-9.

4.       That within an hour or so, and doing the daylight hours, a 12"x12"x12' timber was observed protruding out the side of the M/V PORT GIBSON, was observed with the end floating approximately 8 to 9 inches under the surface of the water and sticking 2 to 3 ft. out from the side of the M/V PORT GIBSON.  It is also the testimony of the Dardars that an attempt was made to remove the timber with the 200 horsepower MULE, which was unsuccessful on the evening of March 17th.  J. Dardar TR, pp. 30-32; and C. Dardar TR, pp. 9-11.

5.       That both Joe Dardar and Chad Dardar thought this timber was stuck in the mud.  J. Dardar 5/27/14 TR, p. 44.

-2-

6.     That Joe Dardar did not specifically inspect the M/V PORT GIBSON for damage or even contemplate the timber could be attached to the M/V PORT GIBSON in some way, shape or form.  J. Dardar TR, pp. 5-6.

7.     That Chad Dardar was inspecting the M/V PORT GIBSON daily, and that he checked under the engines where he could see the bilge and that from the afternoon of March 17th through March 20th at 9:30, he observed no water in the bilge compartment which would indicate that the boat was leaking.  C. Dardar TR, pp. 4-5; 19-20.

8.     That on the day before the sinking, a photograph was taken of the boat, which indicated that the bow was lower than the stern, and that the boat was riding at a proper attitude with no indication that it had taken on any water or that it was leaking in any way.  (Exh. 24 Photo); C. Dardar TR, p. 19.

9.     That at 9:30 p.m. on the night before the sinking, approximately 7 ½ hours before the sinking, Chad Dardar checked the vessel and proceeded to the engine room where he did not hear any leaking water coming into the vessel; did not observe any water in the engine room; and did observe the boat sitting at a normal attitude in the water with no abnormal strains on the lines mooring the vessel or the face wires connecting the M/V PORT GIBSON to the Dredge BUCCANEER.  C. Dardar TR, pp. 19-20.

10.     That at approximately 5:00 a.m. on the morning of the 21st, Chad Dardar was awaken by the attitude of the boat, and when he either fell out of his bed or stepped out of his bed, there was water all the way up to the first deck, which would have resulted in the engine room being completely flooded below the first deck.  C. Dardar TR, pp. 20-24.

11.     That Dardar proceeded off the M/V PORT GIBSON and reported the sinking to Joe Dardar, who immediately went to the scene, and within a short period of time, commandeered Tom's Welding's M/V REBECCA and crane barge, and proceeded to hooking up leads to two padeyes on the stern of the M/V PORT GIBSON and raise the stern of the vessel up in the water, and it remained in this attitude until the salvage, which occurred on March 24th.  J. Dardar TR, p. 17.

12.     That during the salvage, the timber was removed from the M/V PORT GIBSON, and it was later determined that a six inch bolt, approximately 3 ft. from one end of the timber, had punctured a void compartment located on the stern of the vessel, and that it was assumed that the hole caused by the puncture allowed water to come into the vessel, subsequently sinking the vessel some four days later.

## Facts Asserted by the Crew of the COMMANDER

1.     The COMMANDER with five vessels in tow, on the afternoon of March 17, 2012, Jim Brawn, pilot of the COMMANDER, an Inland River towboat, with its tow of five empty barges, arranged two abreast, with its port string of three barges, and its starboard string of two barges, navigated eastbound on the Gulf Intracoastal Waterway-West near Crown Point, Louisiana.  The towboat was made up to the port string, making the flotilla 660 ft. long and 70 ft. wide.

2.     Pilot Brawn encountered a strong southeast wind, which caused its tow to land against the north bank of the GIWW.  Exh. 30, 2692.  Unable to move off the north bank, pilot Brawn knuckled in his starboard engine, and eased up to the east point of the

Crown Point slip, and was going to use the Point as a fulcrum to twist the tow out into the waterway to allow the head to come out and proceed east bound.  Jim Brawn TR, pp. 5-6 (hereinafter "Brawn TR, p.(p.)____").

3.     Pilot Brawn attempted this twisting maneuver two or three times before being stopped by Joe Dardar, who had approached the COMMANDER in a small pleasure craft, and told them to stop, that the tow was on originally his pipeline, and then later, Dardar changed it to the head of the tow being on his barges.  Brawn TR, pp. 9-10.

4.     There were no complaints from Dardar about any break-a-way, and nothing was mentioned about a break-a-way to the crew of the COMMANDER.  Capt. Pete Strecker and pilot Jim Brawn, and the other crew members all mentioned that Joe Dardar's only complaint was that they had run over originally his pipeline, and then he changed it to his sunk barges.  Brawn TR, p. 12; Pete Strecker TR, pp. 11, 15 (hereinafter "Strecker TR, p.(p.)____"); Jamie Kalb TR, p. 16 (hereinafter "Kalb TR, p.(p.)____"); and John Rhodes TR, pp. 15-16 (hereinafter "Rhodes TR, p.(p.)_____").

5.     The incident report and 2692, and email sent by Capt. Strecker concerning the incident, did not mention any break-a-way, but did specifically state that they had run over two small work barges.  Exhs. 29, 30.

6.     Mark Shiffer, Natures Way's surveyor, came to the scene on the evening of the 17th, and interviewed the crew.  He testified that he also talked to Joe Dardar before leaving the vessel to arrange for a meeting the next day.  Shiffer stated that no one mentioned anything about a break-a-way to him that night, including Joe Dardar.  Mark Shiffer TR, p. 13 (hereinafter "Shiffer TR, p.(p.)____").

7.      Shiffer, representing Natures Way, proceeded to the scene the next day, and talked to Joe Dardar.  It was Shiffer's purpose, as representative for Natures Way, to ascertain the full extent of damage that was being claimed by Joe Dardar as a result of the incident.  Dardar did mention that they a couple of his vessels had broke loose, but importantly, he relayed to Shiffer that he had inspected the vessels, secured the vessels back in place, and that there was no damage or problem other than a couple of busted lines and he was not going to worry about that.  Shiffer TR, pp. 14-18.

8.      At no time did Joe Dardar mention anything about a timber that was protruding out the side of the M/V PORT GIBSON.  Shiffer testified that had Dardar mentioned anything about a timber that was protruding outside the M/V PORT GIBSON, that would have alerted him to inspect further.  He testified he would have done a visual inspection around the M/V PORT GIBSON; boarded the M/V PORT GIBSON and performed a detailed inspection in the hull of the M/V PORT GIBSON to ascertain if there was any problem or damage sustained by the M/V PORT GIBSON as a result of the alleged break-a-way.  Shiffer TR, pp. 21-22.

9.      Our crew members did not find out about a break-a-way until a week or so after the incident when the company notified them of the sinking of the M/V PORT GIBSON.  Kalb TR, p. 18; Rhodes TR, p. 16; Brawn TR, p. 16; and Strecker TR, p.15.

10.      Of the four lines that allegedly broke, only two lines were produced for inspection to the experts.  Unfortunately, the lines were not identified or marked, and there was no way for any of the experts to actually know whether or not the lines they were

looking at were in fact the lines involved in the alleged break-a-way.  John Pope TR, pp. 18-19 (hereinafter "Pope TR, p.(p.)_____"); and Arthur Sargent TR, p. 6 (hereinafter "Sargent TR, p.(p.)____").  However, the testimony of Arthur Sargent was clear, that in his opinion were that the general overall condition of the lines were that they were in poor shape, that they had been around and abused.  Sargent TR, p. 5.  In addition, it was Sargent's opinion that none of the lines that he saw broke under a strange or tinsel force.  Sargent TR, p. 9.

11.     The wheelwash of the COMMANDER did not create any significant waves that would allow the M/V PORT GIBSON to bounce up and down in the water to the extent that it would be able to create enough vertical force coming down on the timber boat to puncture the hull of the M/V PORT GIBSON.  Shiffer TR, pp. 37, 39; and Sargent TR, p. 20.

12.     The force which punctured the hull was a vertical force.  Shiffer TR, p. 53; Arnold Lachmann TR, p. 14 (hereinafter "Lachmann TR, p.(p.)____").

## Credibility of the Dardars

The Court is faced with a big credibility issue in that the testimony of the Dardars: Joe, Chad, and Shannon differ greatly in many pertinent and relevant facts.  Natures Way asserts that the grounding incident and resulting sinking of the M/V PORT GIBSON could not be connected based upon the Dardar's testimony.  As such, it is impossible for the Court to determine exactly what caused the M/V PORT GIBSON to sink.  Since the Plaintiffs have the burden of proof, and must prove their case by a preponderance of the evidence, Plaintiffs' claim should be dismissed.

Joe Dardar testified at trial that he was in the yard when he allegedly heard the COMMANDER's engine screaming in reverse; and at that time, the head of the tow had not made contact with the Point.  He testified that he ran to his small boat, the NEPTUNE, had a little trouble cranking it, and by the time he got it cranked, the flotilla of the dredge BUCCANEER, M/V PORT GIBSON, and M/V DAWN STARR, had broke away and was floating across the slip to the soft, marshy bank.  He stated that he proceeded to the pilothouse and got the pilot to stop all maneuvers.

Joe Dardar further testified that he told the Captain and pilot of the COMMANDER that his flotilla had broken away, and that he told the Coast Guard that he had a break-a-way, and he further testified that the Coast Guard told him that the COMMANDER reported that they had broke away Dardar's boats.  J. Dardar 5/28/14 TR, pp. 13, 16, 20.

However, at trial, Dardar testified that he was in the yard when he saw the head of the tow before it hit the point.  J. Dardar TR, p. 13.  However, in his statement given September 5, 2012, he stated he was on the stern on one of his boats towards the outside of the slip.  Dardar TR 5-27, pp. 13-14.

Chad Dardar testified at trial that he was standing in the yard with Shannon, and maybe Joe; however, in his deposition he testified unequivocally he was standing with Shannon and Joe Dardar.  C. Dardar TR, p. 6.

Chad Dardar and Shannon Dardar were adamant that what brought their attention to the problem was when their vessels allegedly started breaking away; and at that time, the COMMANDER allegedly was already on the Point.  Dardar TR, p. 7.  Shannon Dardar TR, p. 4 (hereinafter "S. Dardar TR, p.(p.)____").

As stated earlier, Joe Dardar said that he reported the fleet break-a-way to the Coast Guard and to the crew of the COMMANDER; however, Capt. Pete Strecker, pilot Jim Brawn, and deckhands, Jamie Kalb and John Rhodes all testified that Dardar did not say anything to them about a fleet break-a-way; that they never observed a fleet break-a-way; and that they did not report a fleet break-a-way to the Coast Guard, nor did the Coast Guard say anything to them about a fleet break-a-way.  Also, Joe Dardar had no explanation as to why the Coast Guard report, Exhibit 73, did not mention a break-a-way or any other casualty other than the grounding on his barges.  J. Dardar TR 5/27, pp. 20-22; Strecker TR, pp. 11, 15-16; Kalb TR, p. 16; Rhodes TR, p. 10; and Brawn TR, p. 16.

Importantly, Capt. Strecker filled out an incident report, Exhibit 29, and provided the information for the 2692, Exhibit 30, and also wrote an email to Billy Haney at 8:09 p.m. on the evening of the 17th, that the only damage was to the sunk barges of Joe Dardar, and no fleet break-a-way was mentioned in either the incident report, the 2692, nor the email. Capt. Strecker was adamant that had a fleet break-a-way occurred, it would have been noted in these documents.  Strecker TR, p. 18.

On the issue of credibility, common sense certainly comes into play.  The credible evidence produced at trial, clearly shows that assuming that a break-a-way occurred at some point in time; after the Dardars got the flotilla back in its originally moored position, the Coast Guard gave permission to the COMMANDER to try to remove itself from Dardar's sunken barges.  The testimony from the COMMANDER's crew was that the pilots attempted to back off the Point by reversing its engines with full power, and twisting the

stern back and forth by use of the rudders in an effort to extradite the head of the tow from the sunk barges.  The estimates range from approximately 15 minutes to 30 to 40 minutes, and after it appeared that they would not be able to get off of the Point; then Joe Dardar came and placed the M/V MISS VIRGINIA on the port side of the tow, and began pushing with a straight ahead rudder, with its wheelwash going directly into the slip towards the moored barges.  Please see diagram attached hereto as Exhibit "B," which shows the direction of wheelwash from the M/V COMMANDER and from the M/V MISS VIRGINIA when the M/V MISS VIRGINIA was on the port side of the tow pushing. M/V MISS VIRGINIA is directed straight into the slip.  If a break-a-way occurred, it probably was when the M/V MISS VIRGINIA was assisting.  Please see diagram attached hereto as Exhibit "C," which shows the wheelwash from the M/V COMMANDER and M/V MISS VIRGINIA when the M/V MISS VIRGINIA was on the starboard side of the tow backing. Rhodes TR, pp. 12-13; Brawn TR, pp. 13-15; and Strecker TR, pp. 12-13.

Chad Dardar, when asked if the M/V MISS VIRGINIA assisted on the port side of the tow, testified that he could not remember.  C. Dardar TR, pp. 11-12.  Joe Dardar, at trial testified that he only used the M/V MISS VIRGINIA on the starboard side of the COMMANDER's tow; however, during his deposition, he testified that he used the M/V MULE on the port side of the tow with its wheelwash directed straight towards his vessels in the slip.  Plaintiff's expert, John Pope, understood that Joe Dardar used the MULE to assist the COMMANDER off the Point, and he got that information from Joe Dardar's report.  Pope TR, p. 26.

-10-

Shannon Dardar testified that only the M/V MISS VIRGINIA was used.

However, why would Joe Dardar attempt to push the tow off his sunk barges with the M/V MULE when he testified all during the trial, that the M/V MULE did not have enough power to pull a timber stuck in the mud; and the M/V MULE did not have enough power to pull the three vessel flotilla back to its moored position, and that flotilla was not stuck on anything.

It makes no common sense that the M/V MULE would have been used to try to pull five jumbo barges and an 1800 horsepower vessel off of sunk barges when the 1800 horsepower M/V COMMANDER by itself was not able to pull off those sunk barges.

What further defies common sense, is the fact that if the flotilla did break-a-way shortly after the COMMANDER landed its tow on the Point; and that break-a-way was the result of the wheelwash of the COMMANDER; then, after getting Coast Guard approval, why did Joe Dardar allow the COMMANDER's pilots to use the same exact maneuvers for 15 to 45 minutes prior to coming to assist the COMMANDER; and without any arguments or without any complaints from Joe Dardar or anyone else at his facility about the wheelwash during this extended period of time.  The crew of the COMMANDER stated they received no complaints about their maneuvers after the Coast Guard gave them permission to try to get off the Point, and at no time did Joe Dardar or any of the Dardars mention to them that they were creating excessive problems in the slip, and that they had broken away any barges.

Additionally, why did he join in with the M/V MISS VIRGINIA creating more wheelwash.

The credible evidence clearly indicates that the M/V MISS VIRGINIA was placed on the port side of the tow, and its wheelwash was directed into the slip.  The only reasonable explanation after considering these facts is that the wheelwash from the COMMANDER was not forceful enough to create any problems in the slip because if it was, Joe Dardar would have never allowed the COMMANDER to resume the same maneuvers that it had been doing when the alleged break-a-way occurred; and then assist the COMMANDER by using a 900 horsepower vessel with its wheelwash directed into the slip.  It just does not add up.

Another issue on credibility is that Joe Dardar testified that Capt. Strecker would not get into his boat, and that there was nobody with him in his boat.  However, all the crew members of the COMMANDER, including Capt. Strecker, testified that Capt. Strecker did in fact get in his boat and attempted to investigate the grounding, and that there was a woman with Joe Dardar at the time.  Kalb TR, p. 8; Rhodes TR, p. 11; Brawn TR, pp. 10-11; and Strecker TR, p. 11.

Another interesting observation concerning the credibility of the Dardar story, is the fact that Joe Dardar took approximately nine photographs of the COMMANDER and its tow after the COMMANDER's tow landed on the Point with his cell phone.  However, Joe Dardar offered no explanation at all as to why he did not take any photographs of the alleged break-a-way or any photographs of the alleged lines which broke.  In fact, the

photographs he did take clearly show that the COMMANDER was so far away from the slip that its wheelwash would not have much of an effect on Dardar's vessels inside the slip, and there was no indication of any of the photographs that he took of the COMMANDER and tow of any wave action created by the wheelwash of the COMMANDER; and in fact, the photographs reveal little or no affect on the water even close to the COMMANDER, and no affect towards the head of the tow.

Another point that severely questions the credibility of Joe and Chad Dardar, is the fact that their testimony concerning the "magic" timber which suddenly appeared allegedly protruding out the side of the M/V PORT GIBSON allegedly after the M/V PORT GIBSON was placed back in its moored position within a short period of time after allegedly breaking away and floating approximately 50 ft. to 60 ft. to the soft and marshy mud bank across from where it was moored.

Joe Dardar admitted that in 40 years, he had never seen any timber stuck where the M/V PORT GIBSON was moored; admitted that the timber protruding out 2 to 3 ft. from the M/V PORT GIBSON; that the M/V PORT GIBSON went a short distance across the slip after the alleged break-a-way; that the boat was put back in the same location; that the timber was not stuck in the mud before the break-a-way; and that he could not pull it out. He still testified that he thought that it was stuck in the mud and not attached to the M/V PORT GIBSON.  J. Dardar TR 5/27, pp. 42, 45.

Additionally, he had no answer whatsoever as to how the timber got stuck in the mud far enough to where he could not pull it out with the M/V MULE. J. Dardar TR 5/27, pp. 42, 53.

It defies common sense and what a reasonable prudent vessel owner would think after (1) trying to remove the timber which was not there before the alleged break-a-way, and (2) trying unsuccessfully to remove the timber with a 200 horsepower vessel; knowing the timber that was not there prior to the alleged break-a-way.  Thinking that the timber was stuck in the mud instead of being attached to the M/V PORT GIBSON is the thought process of either a vessel owner who does not have a clue, or a person who is trying to come up with a story, other than the truth, to assess liability against another party.

Both Joe and Chad Dardar testified seeing the end of the timber floating just beneath the surface of the water.  It should also be noted, that the testimony of their expert, Arnold Lachmann, also was that the timber was capable of floating.  Lachmann TR, p. 13. Defendant's expert, Mark Shiffer, also testified the timber was capable of floating, and was in fact floating, because assuming that Joe and Chad Dardar truthfully testified that they saw the end of the timber floating just beneath the surface of the water.

## LEGAL ARGUMENTS

### Elements of a Cause of Action In a Maritime Negligence Case

The elements of a maritime negligence cause of action are as follows:

1.     The existence of a duty required by law;

2.     A breach of that duty;

3.     A reasonably close causal connection between the offending conduct the resulting injury ("proximate cause"); and

4.     Actual loss, injury, or damage suffered by the Plaintiff.

-14-

The burden of proof of these elements are on the Plaintiff.  The Standard of Proof is a preponderance of the evidence, whether direct or circumstantial.  See *Valentine v. United States*, 630 F.Supp. 1126, 1132 (S.D. FL 1986).  See also, Thomas J. Schoenbaum "Admiralty and Maritime Law" 4th Ed. §5-2 at pp. 183, 184.

In the instant case, Natures Way has admitted responsibility for the damages to the two barges that were situated on the Crown Point point, when the tow of the COMMANDER landed on the Point.  However, Natures Way contest that it is responsible for any damages sustained as a result of the alleged break-a-way of the flotilla consisting of the M/V PORT GIBSON, the Dredge BUCCANEER, and the M/V DAWN STARR.

Natures Way takes the position that there was no break-a-way; but, even if there was a break-a-way; the break-a-way was proximately caused by the improperly moored flotilla with old and defective lines and/or by the wheelwash of the M/V MISS VIRGINIA while assisting the COMMANDER.

Natures Way also asserts that the requirement of proximate causation is lacking.

The Plaintiff has the burden of proof in causation and facts; he must introduce evidence which provides a reasonable basis for the fact finder to make the causal determination.  Causation cannot be based upon speculation or conjecture, or upon equally balanced probabilities.

*Id.* at p. 190

Importantly, "I[n] admiralty, the touchstone or proximate cause is forseeability; the injury or damage must be a reasonably probably consequence of the defendant's act or admission."  *Id.* at p. 190.

-15-

The Fifth Circuit Court of Appeals has outlined the following test to ascertain whether harm was foreseeable:

> We perceive a harm to be the foreseeable consequence of an act or admission if harm of a general sort to a persons of a general class might have been anticipated by a reasonably thoughtful person, as a **probable** result of the act or admission, considering the interplay of natural forces and likelihood of human intervention.

*Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th Cir. 1987).

The *Consolidated Aluminum Corp.* case followed previous 5th Circuit precedent of *Republic of France v. United States*, 290 F.2d 395 (5th Cir. 1961), which quoted *Dalehite v. United States*, 346 U.S. 15, 42, 73 Sup. Ct. 956, 971, 97 L. Ed. 1427 (1953), the court "we held that to be found liable a defendant must have 'knowledge of a danger,' not merely possible, but probable..." 290 F.2d at 401.

The law of foreseeability as set forth in *Consolidated Aluminum*, has been followed in *Lloyds Leasing Ltd. v. Conoco*, 868 F.2d 1447 (5th Cir. 1989), and recently in the Eastern District of Louisiana in *Grisclair v. Galliano Marine Service*, 484 F.2d 518 (Ed. LA 2007); and *In Re: Oil Spill by the Oilrig "Deep Water Horizon" in the Gulf of Mexico on April 20, 2010*, 2011 WL 4829905 (Ed. LA 2011). In the two Eastern District of Louisiana cases, *Consolidated Aluminum* was the primary case relied upon for the reasoning setting forth the law concerning foreseeability.

In the case at bar, the issue for the Court to decide is whether or not it was foreseeable for Natures Way, through their pilots, to anticipate that by trying to extricate its tow off the Point by reversing its engine with the propellers over 600 ft. away from the

slip where Plaintiffs' vessels were moored, would cause a break-a-way of a properly and prudently moored flotilla of three vessels; and that the vessel would float a short distance of 50 ft. to 60 ft. across to a mud and marshy shore.  Then, anticipate that the "probable" result of trying to extricate its tow from the Point, the hull of one of the vessel would be damaged by a puncture from a 6" spike on a 12"x12"x12' timber; and that the vessel would sink four days later as a result of a slow leak in the vessel; and taking into consideration that Natures Way's representative surveyor, was told on the day following the incident, that the vessels had been inspected, secured, and were not damaged, and not to worry about any damages other than the damages to Plaintiffs' barges that were struck on the Point.

The question is that how could the pilots of the COMMANDER and/or the management of Natures Way Marine, foresee this unlikely and unprecedented sinking when the owner of the vessels, who had been involved in utilizing and mooring vessels in the slip in question for over 40 years, had no conception that the M/V PORT GIBSON could even been damaged; much less, sunk within four days of the incident.

As the Court is aware, Joe Dardar testified that he had no idea or no conception that the M/V PORT GIBSON could have been damaged from the incident, and could not fathom that the M/V PORT GIBSON would sink in four days.  Arnold Lachmann testified the same way, and all of the witnesses would have testified that way, but the Court did not desire any additional evidence on this very important point.

-17-

It certainly was not foreseeable that the boat was capable of sinking after it drifted 50 ft. to 60 ft. across the slip to the soft mud bank.  Applying 5th Circuit precedent, the COMMANDER pilots certainly could not anticipate that the "probably" result of the rounding would result in the sinking of two vessels four days later.  This foreseeability was especially compromised when Joe Dardar told Natures Way's representative, Mark Shiffer, the next day on the 18th, the day following the casualty, that he had inspected everything, secured the vessels back, and that there was no damage and we had nothing to worry about other than the two barges that were damaged as a result of the grounding of the head of the tow on the point of the island.

This fact is extremely important because Joe Dardar, as owner of the M/V PORT GIBSON, had a duty to prudently, and in a seamanlike manner, inspect his vessel after the break-a-way.

At this time, Joe Dardar had full custody and control of his vessels.  He, as owner, was solely responsible for maintaining, checking and inspecting his moored vessels.  By informing Mark Shiffer, Natures Way's representative, that there were no more damages, everything was secure as far as the M/V PORT GIBSON and Dredge BUCCANEER, Natures Way would be legally released from any further liability.  There was no way for Natures Way to foresee at that time that the M/V PORT GIBSON and Dredge BUCCANEER would sink three days later or had been damaged the day before.

Another fact complicates this legal duty, and that is the alleged finding of a 12"x12"x12' timber protruding out the side of the M/V PORT GIBSON shortly after the

-18-

break-a-way.  Further clouding the issue is the fact that Joe Dardar testified he tried to pull the timber away from the M/V PORT GIBSON with a 200 horsepower vessel and was unable to do so.  Then, the next day, when Natures Way's representative, Mark Shiffer, arrived at the scene specifically to ascertain any and all damages that were caused by the COMMANDER on the evening before, Joe Dardar failed to mention the existence of the alleged timber and his unsuccessful attempt to remove the timber from the side of the M/V PORT GIBSON.

Assuming that the timber was protruding out from the M/V PORT GIBSON and Joe Dardar actually saw the timber on that first evening as he testified, a reasonably prudent owner would have at least mention the fact to Natures Way's representative; and had he done so, Mark Shiffer testified that he would have immediately performed a thorough inspection of the vessel in light of the proximate location of the timber to the M/V PORT GIBSON and would have entered the engine room and looked in the void compartment where the timber was impaled and would have taken steps to safeguard the vessel and keep it from sinking.

It is certainly not foreseeable that the vessel could float across, on a horizontal path, and impale itself on a timber with a vertical puncture on the bottom of its hull by merely floating 50 ft. to 60 ft. across to a soft mud and marshy bank.  This is especially so after Shiffer was told by Joe Dardar that he had inspected everything and there was no damage other than to his sunk barges.  J. Dardar 5/28/14 TR, p. 4; Shiffer TR, p. 18.

## Duty of Crown Point and Joe Dardar to Provide Safe Moorings

Crown Point and/or Joe Dardar, stand in the shoes of a fleeter when vessels are being moored at their facility.  To meet the duty of safe mooring, a fleeter must properly tie off barges, using enough and appropriate lines and rigging.  See *Wisconsin Barge Lines, Inc. v. Barge KIM301*, 390 F.Supp. 1388 (M.D. LA 1975), reversed on the other grounds, 546 F.2d 1125 (5th Cir. 1977)(fleeter has a duty to make sure adequate and proper lines are used).  The size of fleet, water conditions, potential wavewash, and weather forecast are all factors the fleeter is to consider when determining what manner of mooring is appropriate.  *Cargill v. Columbia Marine Service*, 1986 AMC 1894, 1896-97 (S.D. OH 1986).  In addition, a fleeter must conduct intermittent inspections of the fleet.  See *E.G. Cargill*, 1986 AMC 1896, and, of course, fleeters who discover hazardous conditions must take action to prevent sinking or damage to vessels.  *United Barge Co. v. Notre Dame Fleeting and Towing Service*, 568 F.2d 599, 602-03 (8th Cir. 1978)(negligence for fleeters failure to conduct inspection).

In the case at bar, Joe Dardar had a legal responsibility to properly moor the vessels by not allowing any slack in the lines, and by using good and proper lines.

John Pope, Plaintiff's expert, testified that the lines were rated at 85,000 lbs. of breaking strength (TR, p. 48), but that if there was any slack in the lines, that would allow excessive movement, and the weight of several vessels could cause the lines to break. (Direct Examination).  It should be noted that he testified the forward thrust of the COMMANDER was calculated at 37,865 lbs.; however, he did not calculate the reverse

thrust, which would be applicable in our case.  He did admit the reverse thrust would be less, and he did admit the thrust is calculated at the wheels and it would be much, much less as it got further from the wheels.  Pope TR, pp. 45-48.  Good sufficient lines anywhere near rated at 85,000 lbs. would have not broken.

He also was not able to properly identify the lines that he looked at because the lines were not identified or marked, and there was no chain of custody indicating that these were the lines that were involved in the alleged break-a-way.  TR, p. 18.  He did not know if the lines he looked at were the lines that actually broke.  TR, p. 19.  In fact, he was shown a series of photographs that were taken of the two lines that he had examined, and he basically either stated that the lines had appeared to be cut, or he could not tell if they were cut or not.  TR, pp. 49-52.  Furthermore, he did not perform any analysis on the breaking strength of the lines he examined.  TR, p. 64.  He admitted that if there was any chaffing on the hull of the vessels, you would definitely lose strength on the lines.  TR, p. 64.

Defendant's experts, Mark Shiffer and Arthur Sargent, testified concerning their opinions of the lines.  Shiffer, when asked by the Court what could cause the lines to break, replied that "in this case you'd have to have a line about ready to break." Shiffer, TR, pp. 46-47.

Arthur Sargent went into more detail concerning the lines, and after seeing the series of photographs of the lines that he examined introduced as Exhibit 24, his testimony of the general overall condition of the lines was that they were in poor shape, and they had been around and abused.  There was testimony of four lines that broke, but he and the other

experts only had two lines to inspect.  Sargent TR, pp. 5-6.  Unfortunately, he, along with Pope, where not able to identify the lines as the lines that actually was involved in the alleged break-a-way since the lines were not marked or tagged or identified in any way whatsoever.  Sargent TR, p. 6.

When reviewing Exhibit 24, the series of photographs depicting the lines allegedly that broke during the break-a-way, Sargent testified that the lines appear to be cut, and some had birdcages in them indicating that the line had either been kinked or it had been injured in some manner.  Sargent TR, pp. 6-9.

Sargent, in response to a question to a question by the Court, noted that the wheelwash of the M/V MISS VIRGINIA, in his opinion was sufficient to cause the mooring lines to rub up against the edge of the vessels.  Sargent replied that if the vessels are not properly tied, and if the lines were not satisfactory or sufficient, obviously, the lines could break, be cut and moved along.  However, in our case, we were dealing with lines that had been used, abused, through chemical actions or other actions from the sun, which weaken the lines, then all of a sudden, they fail.  Sargent TR, p. 18.

The Court also questioned Sargent, "in a two year period would you expect the lines to be broke and he described."  Sargent replied that the traffic going up and down the Intercostal Waterway, producing waves would create motions of the vessels within the slip so that the lines would chaff, and eventually damage and fail.  Sargent TR, p. 33.

It was Sargent's opinion that the lines broke because they were inefficiently moored and were not proper mooring lines.  The wheelwash created by the COMMANDER and

-22-

the M/V MISS VIRGINIA, in his opinion, would be so small compared to the strength of the lines; and as such, the lines should have been able to hold the vessels in position. Sargent TR, p. 35.  It was Sargent's opinion, that the lines broke because they were cut, which means they were constantly being chaffed.  In his opinion, this chaffing did not occur in a couple hours; it occurred over a couple of years of chaffing.  Sargent TR, p. 35. Finally, Sargent testified in response to a question from the Court, that lines that had been in use for two years, and constantly wearing for two years, being soaked for two years, and in the sun for two years, will start to wear out and are expendable.  Lines are not something that you put on to last a lifetime.  Sargent TR, p. 36.

The only credible evidence before the Court is that proper mooring and sufficient mooring lines would have prevented any break-a-way that could have been caused by the wheelwash of the COMMANDER.  In fact, the credible testimony of Arthur Sargent indicates that even with the wheelwash of the M/V MISS VIRGINIA added to the COMMANDER's wheelwash, properly moored vessels with proper lines would not have broken away as a result of the forces generated by the two vessels.

The Court should also be concerned that the lines were not marked or identified, and no one has any assurance that these were even the lines that were involved in the alleged break-a-way; but if they were, the testimony of all the experts, including John Pope, indicated that the lines had been cut, and there was not evidence of lines that broke because of a strain placed upon them.

Dardar failed in his duty to have the properly moored fleets, and if the fleet had been properly moored, the alleged break-a-way would not have occurred.

The operators of the COMMANDER have every right to assume that Dardar had a properly moored fleet of vessels, and that their wheelwash, from over 600 ft. would not present a problem to a properly moored fleet.

### Dardars Testimony Versus Physical Facts/Physics/Laws of Nature

As stated earlier, the Dardars testified the M/V PORT GIBSON was bouncing up and down in the water like a cork.  Even though the credible evidence will not support that testimony; even if we assume the M/V PORT GIBSON was bouncing up and down as it proceeded across the slip, the puncture by the timber still could not have occurred under that scenario.  First of all, there is no question that the timber was a floating timber.  The testimony of both Joe Dardar and Chad Dardar clearly establishes that the timber had to be floating in order for them to see the end of the timber just below the surface of the water.  Please refer to diagram attached hereto as Exhibit "D," which shows a floating timber beside the hull of the boat.  All the witnesses testified, it would be physically impossible for the M/V PORT GIBSON to drift across the slip, and even bouncing up and down like a cork, to be punctured by a floating timber.  Arnold Lachmann's only explanation for the vertical puncture was that if the timber was underneath the boat when it came on ground, the weight of the boat coming down on it could puncture it.

Even John Pope, Plaintiff's other expert, testified that it would be unlikely that a floating timber could hole the M/V PORT GIBSON.  Pope TR, pp. 40, 62.

Defendant's expert, Shiffer, also stated that in his mind, a floating timber could not cause the puncture in the hull of the vessel under the facts as testified to by the Dardars.

See diagram attached hereto as Exhibit "E" depicting a floating timber floating at least 3 ft. above the puncture site.

All of this testimony was based on the facts as testified to by the Dardars, and the testimony also assumed an accidental puncture.

Even if the timber was a submerged timber; of which there was no credible testimony, the puncture still could not have occurred under the facts as testified to by the Dardars.  If the submerged timber was laying on the mud line when the M/V PORT GIBSON drifted over to the mud bank and settled, there would still be a distance of at least a foot between the end of the bolt and the puncture site.  Please refer to diagram  attached hereto as Exhibit "C."  The submerged timber is on the mud line with the bottom of the vessel on the mud line with one foot in distance between the location of the puncture and the end of the spike.

Even if we assume that the boat was bouncing up and down as it was coming across the slip, in order for the timber that was submerged and laying on the mud line to puncture the vessel, it would have to be some force that would not only lower the vessel over a foot in order to puncture the hull, but that force would also have to displace the mud that the boat was sitting on.  It would take a tremendous amount of force to push the boat through the mud for at least a foot in order for the puncture to occur and that force would have to be one sustained powerful thrust since there is no indication whatsoever at the puncture site of any horizontal scratches or any evidence where the boat contacted the hull in any location other than that one spot where the puncture occurred.  Exhibit "D" is a diagram showing the timber and boat sitting on the mud line.

There is absolutely no credible evidence whatsoever, that a force any where near one that would be required to puncture the boat and force the boat down for over a foot on top of the timber is accounted for in an accidental setting.

Even John Pope, Plaintiff's expert, acknowledged that the timber would have to be in the water with something underneath it, because the timber would need something underneath it to give it some sort of force, some contact point.  If a force came down on the timber while it was in the mud, the timber would be pushed down into the mud and there would never be enough force to actually puncture the hull.  If the boat sinks down in the mud, the timber would sink down in the mud also.  Pope's example did not consider the one foot difference between the puncture and the top of the bolt.

Please see Exhibit "D," which would be a stern elevation view of the boat indicating where a submerged or non-floating timber would be located after impaling the hull of the vessel.  As you can see from the diagram, the timber would be situated well below the water line and out of sight of the Dardars.  Please compare that diagram in Exhibit "D" to the diagram attached hereto as Exhibit "B," which shows a floating timber attached to the hull, as testified to by the Dardars, extending with one end floating up within 9" or so of the water line.  If we were not dealing with a floating timber, the timber would look as indicated in diagram attached hereto as Exhibit "D."

This is extremely important because all the experts, including the Plaintiffs', testified that if the timber was capable of floating, it could not puncture the hull of the M/V PORT GIBSON considering the facts as stated by the Dardars.

More importantly, is the fact that only the Dardars testified about seeing the timber prior to the sinking.

## The Slow Leak

It is the position of the Plaintiffs that the M/V PORT GIBSON's hull was punctured on the afternoon of March 17th, and that a slow leak resulted causing the vessel to sink four days later on the morning of the 21st.   However, the testimony and physical facts as presented by the Plaintiffs, clearly do not support this position; and frankly, should completely absolve Natures Way from any responsibility whatsoever.

The testimony from the Dardars was that while Joe Dardar did not send anyone to inspect the M/V PORT GIBSON, after he allegedly observed a timber sticking out from the side of the M/V PORT GIBSON; the vessel was allegedly inspected by Chad Dardar, on a daily basis.  Chad testified that he would go in the engine room on a daily basis, and look under the engine where he could observe the bilge of the boat, and if there had been any water in the bilge, he could have seen it, and he reported that he did not observe any water in the bilge all the way up until his last inspection, which occurred at 9:30 p.m., just 7 ½ hours before the sinking.  C. Dardar TR, pp. 4-5; 19-20.

The testimony was uncontradicted that the vessel was sitting high and dry, even with the stern higher than the bow, just hours before the sinking as depicting on Exhibit 24, photographs taken the day before the sinking.

This evidence would certainly indicate or dictate that if there was a hole in the vessel; and if the timber had actually punctured the vessel on the 17th; that this was indeed

-27-

a very, very, very slow leak since it had not entered the engine room at all after four days. Or, on the other hand, there was no puncture in the hull until shortly before the sinking. Only the Dardars know exactly what happened.  The only thing that is shown is that the Dardars story does not add up.  It should be noted that Joe Dardar testified that the void compartment where the puncture occurred was not watertight, and that water entering the void would leak into the engine room.  If the hole actually occurred on the 17th, then it begs the question that if the M/V PORT GIBSON was holed on the 17th, why was there no water observed in the engine room where the water would collect for over four days.

To complicate this issue, there was absolutely no explanation from anyone, including Arnold Lachmann, John Pope, or Mark Shiffer as to what could have occurred after the photograph was taken on the day before the sinking, and after Chad Dardar had checked the vessel 7 ½ hour before the sinking, to completely flood the void and the engine room, all the way up to the first deck in such a short period of time.  Please refer to the attached Exhibit "H"  Diagram "A" depicts a stern elevation view of the boat as depicted in the photograph, Exhibit 24, and as described by Chad Dardar as his observations at 9:30 p.m., 7 ½ before the sinking.  As you can see, the waterline was normal, and the engine room deck elevation, as indicated with the red line.

Exhibit "H," diagram "B" depicts the list of the boat where water is all the way up to the first deck as described by Chad Dardar.

As the Court can see, a tremendous amount of water entered the M/V PORT GIBSON in a very short period of time, some where around 7 ½ hours or so to result in the

boat having a proper trim and attitude to the boat flooded to the first deck.  The entire engine room had to be flooded with water, and there is absolutely no explanation whatsoever, that anyone could come up with that could explain this phenomenon based upon the testimony of the Dardars.  Lachmann's only explanation was that maybe the hole size was increased when they tried to pull the timber out.  Lachmann TR, p. 23.  However, the attempt to pull the timber out, as testified to by the Dardars, was on the night of the incident, and possibly the second day, which would be the 17th and 18th.  If that was the case, and the hole was increased, the boat would have sank at that time and not sit high and dry for two to three more days, apparently with little or no water entering the boat.

Lachmann did testify that Joe Dardar told him on March 23rd that they had tried to pull the timber out with a crane.  Lachmann also testified he took notes of the conversation as Dardar was telling him.  This could explain the opening up of the hole; especially if the crane was used on March 20th.  Lachmann TR, p. 17.

Mark Shiffer testified that based upon the condition and attitude of the boat as depicted in the photographs taken the day before the sinking, he would anticipate that the boat would be in the same attitude the next day.  If it sat for over three days with no change in attitude, and with the appearance that it was not leaking basically at all, you would not expect it to look any different on the fourth day.  Shiffer TR, p. 57.  Shiffer, in fact, stated that you would have to have a dramatic change and something had to happen to it other than what has been testified to because there was no other explanation.  Shiffer TR, pp. 58-59.

Based upon the testimony of the Dardars and Exhibit 24, a photograph of the vessel taken a day before the incident, it is clear that something catastrophic or dramatic had to occur after the photograph was taken and after Chad Dardar allegedly inspected the engine room in order for the boat to be in the condition that it was as depicted on Exhibit "E," diagram "B," and as testified to by the Dardars.

Clearly, Natures Way had nothing to do with that catastrophic event; and as such, this event catastrophic happening, totally unknown to anyone other than the Dardars, since they were the only ones on site, and since they were the only ones with the ability to have this knowledge, clearly relieves Natures Way of any liability, if they were liable at all, for the damages caused by the sinking of the Dredge BUCCANEER and the M/V PORT GIBSON.

## CONCLUSION

Natures Way asks the Court to consider the testimony of the Dardars, and then consider the physical facts, the laws of physics, the laws of natures, and good ole common sense and the inescapable conclusion is that there is no possible way that actions of the COMMANDER's crew could be the proximate cause of the sinking of the M/V PORT GIBSON and Dredge BUCCANEER.  The physical facts does not support the end result, and if the Court is left without an understanding as to exactly the causation in fact of the sinking; and more importantly, the legal proximate cause of the sinking, then the Court must rule in favor of the Defendant, Natures Way Marine, LLC.  The Plaintiffs have the burden of a preponderance of the evidence, and the evidence produced by the Plaintiffs is speculative and not based on any calculations or scientific analysis.

Joe Dardar had a responsibility to moor his vessels in a proper and prudent manner. As vessel owner, Joe Dardar was responsible for inspecting his vessels; and after the alleged fleet break-a-way, when an unknown timber, which he knew was not present prior to the break-a-way, but allegedly showed up after the break-a-way, and he was unable to remove it protruding from the side of his vessel, the assumption that the timber was stuck in the mud is frankly, unbelievable.

The fact that we also have a timber that was capable of floating rules out the puncture being caused as a result of a break-a-way. It is impossible for a floating timber to cause the puncture.

Also, in order for the Plaintiffs to generate a vertical force, the Dardars have the wheelwash of the COMMANDER forcing the 100 plus ton vessels bobbing in the water like corks. The credible testimony contradicts this 100%.

The sinking was not foreseeable, especially after being advised that Natures Way only damaged the sunk barges.

Based upon the credible evidence produced during the trial, and good old common sense, Natures Way would request that this Court dismiss the Plaintiffs' Complaint against it, and rule that the Plaintiffs did not sustain its burden of proof; and as such, is not entitled to recovery.

**RESPECTFULLY SUBMITTED**, this the 20th day of June, 2014.

<div style="margin-left: 40%;">

s/Frank J. Dantone
_____

**FRANK J. DANTONE, MSB #5792**
**HENDERSON DANTONE, PA.**
P. O. Box 778
Greenville, MS 38702
Telephone No. (662) 378-3400
Facsimile No.   (662) 378-3413
Email: fjd@hdpa.com

Attorney for Defendants

</div>

<div style="text-align: center;">

**<u>CERTIFICATE OF SERVICE</u>**

</div>

I, Frank J. Dantone, attorney for Defendants, do hereby certify that on June 20, 2014,

I electronically filed this document through the ECF system, which will send a notice of

electronic filing to the following:

Scott A. Soule, Esq.
*Blue Williams, LLP*

Jade C. McKeough, Esq.
*Blue Williams, LLP*

Overton T. Harrington, Jr., Esq.

<div style="margin-left: 40%;">

s/Frank J. Dantone
_____

</div>

<div style="text-align: center;">

-32-

</div>

**[WILL BE MOVED**

Natures Way takes the position that it was not made aware of any break-a-way on the evening of March 17th while trying to extricate its tow from the sunk barges of Joe Dardar; furthermore, Natures Way asserts that the physical facts in the laws of physics and nature, do not support the Dardar's accidental story. ]

**[WILL BE MOVED SOME WHERE ELSE**

12.    The story of the M/V PORT GIBSON bouncing up and down crossing the slip, in order to have some basis to explain the vertical force that had to exist in order to explain the puncture into the hull of the M/V PORT GIBSON.  Unfortunately for the Dardars, the natural phenomenon of wheelwash from an 1800 horsepower vessel, reversing and the affect of the wheelwash 600 ft. or 700 ft. away is so minimal, that there would be no waves whatsoever produced.

13.    As the Court noted in its questioning of experts, Shiffer and Sargent, waves are not produced by a vessel that is not actually moving either forward in the water or backwards in the water.  Wheelwash from a backing vessel that is hung up and not able to actually move backwards, creates a current in the water that is forceful coming out of the wheels, but as the wheelwash proceeds away from the wheels, the force dissipates, and after 600 ft. or 700 ft., it creates very little force.  Certainly, not enough force to break-a-way vessels that are properly moored with good condition lines.]

<u>Issue of Foreseeability</u>

Another point on the issue of foreseeability, is the fact that assuming Joe Dardar did

-33-

in fact see the timber on the afternoon of the incident, and he attempted to pull it out unsuccessfully with the mule as he so testified; even knowing that the timber was not there thirty minutes earlier before the alleged break-a-way, but was there after the alleged break-a-way, Dardar still allegedly did not have any idea that the timber could be stuck in the vessel, because that was beyond his comprehension.