UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

OSPREY UNDERWRITING AGENCY,                    CIVIL ACTION
LTD, ET AL.

VERSUS                                         NO. 13-211
                                               c/w 13-5792
                                               13-590(pertains to
                                               13-211 & 13-5792)

M/V NATURES WAY COMMANDER, ET AL.              SECTION: "B"(5)

<u>REASONS FOR RULING</u>

To supplement the prior findings at Record Document Number 103, the following factual and legal reasons are assigned.

All parties of record agree to and the Court adopts the following stipulations relative to jurisdiction, venue, mode of trial and material facts for purposes of the trial (Record Document Number 75-1, pp. 4, 13 & 28):

> 1.   Jurisdiction is based on the maritime jurisdiction of this Court.  28 U.S.C. § 1333.   Jurisdiction  and  venue  are  not contested.
>
> 2.   Trial of this case proceeded without a jury.
>
> 3.   The M/V PORT GIBSON ("PORT GIBSON") and the Dredge BUCCANEER ("Dredge") are vessels owned and operated by Plaintiff Crown Point Holdings, L.L.C., and were covered by a marine hull insurance policy issued jointly to Crown Point Holdings, L.L.C. and Plaintiff C & J Crown Point, L.L.C.  The policy was underwritten by Plaintiff Osprey Underwriting Agency, Ltd.

1

4.   The PORT GIBSON and the Dredge were moored in a narrow channel that was part of Bayou Barataria, located just off the Gulf Intracoastal Waterway at Mile Marker 9, at a dock owned by Crown Point Holdings, L.L.C. Also moored at this dock, inside the PORT GIBSON and the Dredge was the vessel M/V DAWN STAR, owned by Consolidated Plaintiff Indian River Transportation, Inc.

5.   On March 17, 2012, the M/V NATURES WAY COMMANDER ("NATURES WAY") and its five-barge tow, while headed eastbound in the Intracoastal Waterway near Crown Point, Louisiana, grounded the head of its tow on two small work flats owned by Crown Point Holdings, L.L.C.
6.   Following the grounding, the NATURES WAY engaged in a number of engine maneuvers in an attempt to free its grounded flotilla.

7.   On or about March 24, 2012, the PORT GIBSON and the Dredge were raised.  The hull of the PORT GIBSON had been punctured by a protruding bolt from a timber that measured 12" x 12" x 12' long.

The foregoing facts constitute the extent of all parties' stipulations that are deemed pertinent for our analysis.

The following parts of this opinion constitute additional findings on material evidence, including credibility determinations and conclusions of law.

The PORT GIBSON is an Inland Rivers push boat measuring about 6.3 feet long x 26.5 feet wide x 7.5 feet in depth. It has a three-level cabin and was built in 1963.  Its approximate weight is 108 gross tons.  Its draft is approximately 5.6 feet; the engine room deck is at approximately 2 feet, with

2

approximately 2 feet of bilge space. The Dredge is approximately 65 feet long x 36 feet wide x 5 feet in depth, and built in 1980. The M/V MISS VIRGINIA ("VIRGINIA") is an Inland Rivers push boat measuring about 54.4 feet long x 21.5 feet wide. Crown Point Holdings, L.L.C. was also the owner/operator of that vessel. The NATURES WAY and its five empty jumbo hopper barge tow were about 664 feet in length and about 70 feet wide, with the width of each barge measuring about 35 feet. Natures Way Marine, L.L.C. was the owner/operator of the NATURES WAY.

The Crown Point slip is a protected facility with mostly local traffic. It is about 150 to 190 feet wide at its mouth to the Intracoastal Waterway ("Intracoastal"), narrowing to about 100 feet immediately aft of the mooring location of vessels staged on the west bank in the slip. There is a federally owned triangular shaped island on the east side of the slip, with soft mud banks. About 50 vessels, mostly tug-barge flotillas, daily pass by the Cross Point slip.

The PORT GIBSON was docked on the west bank side of the Crown Point slip after being dry docked for various works for about three months. It was faced up to the Dredge in contemplation of a dredging job that was set to start in a few days. The DAWN STAR was moored inside of the slip attached to the starboard side of the PORT GIBSON, with the PORT GIBSON and the Dredge at the outermost position into the channel of the

three docked vessels.  That alignment of vessels on the west side was approximately 50 to 60 feet across the slip from the federal island soft mud banks on the east side of the slip.

On the afternoon of March 17, 2012, the NATURES WAY, while headed east in the Intracoastal, became wind bound, lost control, and grounded its five-barge tow (configured as a six-pack) inside of the Crown Point slip onto the point of the federal island.  Prior to this grounding, the crew of the NATURES WAY did not see the two small uninsured work barges moored inside of the point due to the height of its tow's barge hopper coamings and the length of the tow.  In the course of the grounding, the starboard lead barge of the NATURES WAY tow struck, climbed over and sank the two small work barges owned by Joseph A. Dardar ("J. Dardar").  The tow stranded on a short 6" diameter bitt on the small work barges.

At the start of trial, Natures Way Marine confessed and stipulated its navigation of the NATURES WAY was negligent for the grounding and sinking of the two small work barges. Accordingly, the crew violated the statutory "Rules of the Road" by failing to keep a proper lookout for those two small work barges.  Rule 5 of the International Regulations for Preventing Collisions at Sea, 1972, codified at 33 C.F.R. 83.05.

Following that allision, the NATURES WAY engaged in a number of engine maneuvers in an attempt to free its stranded

4

flotilla.  The NATURES WAY pilot attempted to use the point of grounding as a fulcrum to twist the tow off the federal island point and back into the Intracoastal.  This twisting maneuver was tried a few times before being stopped by J. Dardar.

Mr. J. Dardar testified that in response to hearing the NATURES WAY engine screaming in reverse, he ran to his small pleasure boat the NEPTUNE, noticed that the flotilla of the Dredge, PORT GIBSON and DAWN STARR was drifting afloat across the slip towards the east side's mud bank.  He further testified that he told the captain and pilot of the NATURES WAY and the Coast Guard that his three-vessel flotilla broke away from its moorings.  Two of his employee-relatives, Chad Dardar ("C. Dardar", nephew) and Shannon Dardar ("S. Dardar", sister) maintain that their attention was on the vessels that broke away after the NATURES WAY grounding on the federal island point.  However, there is no record by the Coast Guard of any reported breakaway of J. Dardar's vessels on the day of the grounding on his two small barges.  Further, the NATURES WAY captain, pilot and deckhands testified that neither J. Dardar nor anyone else said anything to them that day about a breakaway of vessels.  NATURES WAY's surveyor came to the scene on the same day of grounding, March 17th.  He testified that after interviewing the crew of the NATURES WAY and J. Dardar, none of them mentioned anything about a breakaway that day, including J. Dardar.  The

only complaint from J. Dardar on March 17th relative to any of his vessels dealt with his two small work barges. A day later, on March 18th, J. Dardar stated a couple of his vessels had broken loose, but told the surveyor he inspected the vessels without noticing any damage or problem other than a couple of busted mooring lines. Significantly at this point, the Dardars failed to mention anything about a bolt laden timber protruding out or in close proximity to the hull of the PORT GIBSON during its recovery and re-mooring to Dardar's dock. Moreover, had J. Dardar or anyone else mentioned anything about the timber on March 17th or March 18th when he and C. Dardar saw the timber, NATURES WAY surveyor testified that would have alerted him to do a detailed inspection of the PORT GIBSON's hull for any damage that may have been caused by the timber.

It is unlikely that the Coast Guard would have given permission, as it did here, to the NATURES WAY to try to remove itself from Dardar's two sunken barges if it had indeed received complaints that there was also a breakaway involving vessels in that same slip. In any event, J. Dardar testified at trial that he used the MISS VIRGINIA on the starboard side of the NATURES WAY tow; however, during his deposition, he testified that he used the small dredge tender M/V MULE ("MULE") on the port side of the tow with its wheelwash directed straight towards his vessels in the slip. Plaintiff's expert, John Pope, understood

6

that J. Dardar used the MULE to assist the NATURES WAY tow off
the point, based on information from J. Dardar's report of the
incident.   However, Dardar employee-sister S. Dardar testified
in contrast that the MISS VIRGINIA was used to help back the
NATURES WAY tow off the point.   Regardless, after initially
complaining about the prior maneuvers of the NATURES WAY, J.
Dardar with the aid of his vessels, the MULE and ultimately the
MISS VIRGINIA, eventually proceeded to assist the NATURES WAY
using substantially the same maneuvers to reverse the tow off
the point, with assistance from the additional power provided by
his vessel(s).   There is no credible evidence that the Coast
Guard approved maneuvers generated any complaints of creating
excessive problems in the slip from increased water movements,
*e.g.*, wheelwash or wave actions.   J. Dardar's claim of a
breakaway is drawn into further question by the absence of
photographs of same.   He took several photographs with his cell
phone camera of the NATURES WAY flotilla after its lead tow
grounded on top of his two small work barges, but none were
taken of his larger and more valuable three vessel breakaway
flotilla on March 17th either during the breakaway or during
their recovery from the east bank of the slip by the Dardars.

       We should also note at this point that all parties gave
contradictory and largely speculative evidence about the
condition, usage, and breaking strength of the mooring lines on

the PORT GIBSON and the Dredge.   According to plaintiffs, the broken lines lay snarled on the ground at the Dardar facility for about a year and a half post-incident before being examined. During that time the lines were exposed to changing weather conditions.   The J. Dardar and Osprey expert opined without credible objective support that the breakage was consistent, in his view, with vessel movement as a result of wheel wash from the NATURES WAY.   Like the latter expert witness the defense expert's conclusions that the lines broke due to their worn out condition is also unsupported by credible objective evidence. Both sides do agree that a substantially large amount of applied force was required to break mooring lines.   However, the evidence is unconvincing and inconclusive, under an objective standard of reasonableness, on this issue.   We do recognize that water movement combined with usage and condition of mooring lines could, among other factors, impact line breakage.   We are unable however to speculate that the mooring lines broke or separated in any non-exclusive manner.   Even if the lines broke as contended by plaintiffs, the combined movement generated by the NATURES WAY's reverse thrusting propellers while in the Intracoastal, and the MISS VIRGINIA's forward/reverse thrusting actions while in the Crown Point slip all offer a better set of conditions that could possibly explain any breakage.

More importantly, credible evidence shows according to J. Dardar and C. Dardar within an hour or so of the NATURES WAY grounding on May 17th, and during the daylight hours, they observed a 12-foot-long timber protruding out the side of the PORT GIBSON, with the end floating approximately 8 to 9 inches under the surface of the water and sticking 2 to 3 feet out from the port side of the PORT GIBSON's hull.  On the evening of March 17th an unsuccessful attempt was made by the Dardars to remove the timber out away from the PORT GIBSON'S hull with the 100-horsepower MULE.  Guessing that the timber was stuck in the mud bottom, J. Dardar decided to wait and ask someone with a more powerful vessel to remove the timber, an obvious navigational hazard to the PORT GIBSON and other vessels, on a later date or whenever they had an occasion to leave the slip. No explanation was given why he didn't remove it that day with his more powerful 600-900 horsepower MISS VIRGINIA, the DAWN STARR or other equally powerful and available vessels.  The Dardars did not attempt to inspect the PORT GIBSON's hull or bilge after sighting the bolt-laden timber. Equally troubling was the failure of the Dardars to report anything about the timber prior to the sinking of the PORT GIBSON.  During the post-sinking investigation by defendants' own surveyor, it is reported that J. Dardar told the surveyor that he noticed, one day prior to the sinking, the timber with a large steel rod

9

through it protruding through the bottom of the PORT GIBSON's hull.

The Dardars deny ever seeing the timber until either the March 17th grounding event or a day or two later when it was seen on the port side of the hull of the PORT GIBSON. Credible evidence suggests that the PORT GIBSON's hull was punctured in the way of her port void tank near the stern; that puncture was caused by a tapered, galvanized 1-inch diameter bolt in the 12-foot-long timber. The tapered end of the bolt protruded about 8 inches from the face of the timber. After the puncture and sinking of the PORT GIBSON, C. Dardar reported the bolt as a large steel rod protruding from the timber through the bottom of the PORT GIBSON's hull. The evidence further shows that this puncture caused the PORT GIBSON to take on water and sink several days later, on March 21, 2012, pulling the Dredge BUCCANEER down with her. Prior to the sinking, the Dardars had several opportunities to remove and report the bolt laden timber, but failed to do so. The sinking would not have occurred had the Dardars timely reported the timber's sighting on either March 17th or March 18th.

As seen with the mooring lines issue, the parties presented various scenarios in attempts to determine the timing, locality and methodology of the hull puncture event. There's even a suggestion that the sinking was intentional. We are not

persuaded by any side's evidence in the former or latter instances. Paraphrasing C. Dardar's attorney's post-trial memorandum statements, this case is shrouded in mystery; the mechanics of events are speculative; and in this unusual situation, logic in the final analysis may help resolution.

Our thought process usually involves one of three models. Pathological thinking is often directed by unrecognized emotional thinking; logical thoughts are impartial, non-subjective, non-emotional, dissecting but not necessarily understanding; and psychological thinking progresses by reflection, having as a goal understanding even of the unexplainable. Over months of impartial reflection and the deflection of emotional assumptions, there is insufficient evidence, from either side, to credibly establish by a reasonableness standard when, where or how the hull impalement occurred. As already noted, parties generally agree impalement occurred and that impalement caused the sinking at issue. From there, parties wrangle over when it occurred; whether it happened during or from horizontal versus vertical movements of the PORT GIBSON and/or timber; whether it occurred at the Dardar's west bank facility, at the muddy east bank of the slip or elsewhere; and whether it occurred as a result of water movement during or after NATURES WAY grounding or tidal changes. However helpful answers to the foregoing would be, there is one

inescapable reality.   The Dardars' sighting of a navigational and hull hazard obstacle, the bolt laden 12-foot-long timber, a day or so prior to the sinking event, coupled with their failure to report the sighting or inspect the PORT GIBSON for damage from same constitute extraordinary negligence and the sole proximate cause for its sinking.

Defendants have shown through credible evidence that it was beyond their power to prevent the sinking of the PORT GIBSON and Dredge.   *The Pennsylvania,* 86 U.S. (19 Wall) 125, 22 L.Ed. 148 (1874); *West India Fruit & S.S. Co. v. Raymond*, 190 F.2d 673 (5th Cir. 1951).   As shown earlier, critical information which would have allowed them to take precautionary measures to prevent the sinking was withheld from them by the Dardars. Moreover, as noted earlier, credible evidence has shown that the Dardars' failures to remove the timber, to timely inspect the PORT GIBSON's hull and bilges, and to timely report the timber's sighting, singularly or in combination with each other, were neither the understandable actions of prudent mariners nor foreseeable consequences attributable to defendants. Additionally, while not always necessary to find every misconduct specifically foreseeable, the standard of reasonable conduct may require the defendant to protect the plaintiff against "that occasional negligence which is one of the **ordinary** incidents of human life, and therefore to be **anticipated**".

WILLIAM L. PROSSER, LAW OF TORTS 274 (4th ed. 1971); *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 464 (5th Cir. 1984); *Watz v. Zapata Offshore Co.*, 431 F.2d 100, 116 (5th Cir. 1970)(emphasis added).

The Restatement (Second) of Torts sets forth principles for determining whether an intervening force supersedes prior negligence. They are:

> (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b) the fact that its operation or the consequences thereof appear after the event to be **extraordinary** rather than normal in view of the circumstances existing at the time of its operation;
>
> (c) the fact that the intervening force is **operating independently** of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
>
> (d) the fact that the operation of the intervening force is **due to a third person's act or to his failure to act**;
>
> (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
>
> (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Id.* § 442 (emphasis added). Section 447 continues:

> The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if
>
> > (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or
> >
> > (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or
> >
> > (c) **the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.**

*Id.* § 447 (emphasis added); *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 464-65 (5th Cir. 1984)(en banc).

In the maritime context, "negligent conduct on the navigable waters that causes loss to another constitutes a maritime tort." *United States v. M/V Big Sam*, 681 F.2d 432, 443 (5th Cir. 1982). Here, negligence is conceded for the failure of the NATURES WAY to avoid running aground over and damaging the two small barges on March 17th. Thereafter, defendants provided credible evidence that the sinking of the PORT GIBSON and Dredge on March 21st was not directly or circumstantially attributable to the March 17th grounding events; and that the noted failures

14

of plaintiffs constitute extraordinary negligence and the sole proximate cause of the sinking. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715-16, 44 L.Ed.2d 251 (1975), on remand 522 F.2d 1381, 1975 A.M.C. 1508 (2d Cir. 1975); *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 465 (5th Cir. 1984)(en banc). Additionally, the NATURES WAY did not know and had no reason to know that its maneuvering created an unreasonable risk of harm to the PORT GIBSON flotilla, especially in light of J. Dardar's statement that the flotilla was undamaged except for broken mooring lines. Defendants' duty of reasonable care extends to the duty for harm that is reasonably foreseeable. *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 1981 A.M.C. 458 (5th Cir. 1980). Credible evidence convinces that they fulfilled that duty. Plaintiff, owner of the PORT GIBSON flotilla, also has a duty of reasonable care to warn for harm that is reasonably foreseeable. *Id.* at 827. Credible evidence reviewed above shows that plaintiff owner breached that duty in several respects.

The issues of proximate causation and superseding cause involve application of law to facts. Even if there was an arguable basis in fact to conclude that the impalement of the PORT GIBSON was somehow related to the NATURES WAY maneuvering, the Dardars' failures to remove, inspect and warn anyone about the bolt laden timber they saw protruding from under the PORT

15

GIBSON were so highly extraordinary that a reasonably prudent person could not have foreseen such failures. *Compare*, *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113, 1996 A.M.C. 1817 (1996); *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 652 (5th Cir. 1992); *Nunley v. M/V DAUNTLESS COLOCOTRONIS,* 727 F.2d 455, 464–65 (5th Cir. 1984) (en banc) (citing Restatement (Second) of Torts § 447); *Becker v. Tidewater, Inc.*, 586 F.3d 358, 372 (5th Cir. 2009). It is well-established that a presumption of fault arises when a vessel collides with a stationary object, it violates a safety statute, or its unusual wake, swell, wash or suction causes damage to a moored or anchored vessel. *See West India Fruit & Steamship Co. v. Raymond*, 190 F.2d 673, 674 (5th Cir. 1951) ("fact of injury to [properly moored vessel] from swells prima facie establishes the liability of the [moving vessel]"); *Petro United Terminals, Inc. v. J.O. Odfjell Chemical Carriers*, 756 F.Supp. 269, 274 (E.D. La. 1991) (violation of statutory safe speed rule shifted burden to passing vessel to prove that its fault was not the sole cause of the accident); *New Orleans Steamboat Co. v. M/T HELLESPONT GLORY*, 562 F.Supp. 391, 392 (E.D. La. 1983) ("Once a properly moored vessel proves that a passing vessel caused swells or suction that resulted in damage to the moored vessel, the passing vessel is obligated to exonerate itself from blame."). This case involves none of those

16

circumstances, and the Court finds no grounds for presuming fault here against the NATURES WAY for the sinking of the PORT GIBSON flotilla.   Considering the entire circumstances of events, the Dardars' failures were solely at fault for and, alternatively, the superseding cause of, the sinking of the PORT GIBSON and the Dredge BUCCANEER.   Credible evidence convinces that the post-grounding maneuvering of the NATURES WAY was not a contributing factor to the flotilla's sinking about four days later.   As stated before, even if it arguably was a factor the superseding cause was the noted extraordinary misconduct of the Dardars.

For about a week since his hiring, C. Dardar had been working at the Crown Point facility readying the tug PORT GIBSON for a job.   He was hired by his relative J. Dardar to be a deckhand on the PORT GIBSON. The only night he slept on the tug was on the date of the incident. His duties prior to sinking were to maintain its equipment, ready it for a dredging job, general housekeeping, clean-up of refurbishment debris, as well as securing the mooring lines of the tug and the Dredge. Most if not all of his assignments were done aboard Crown Point's vessels.   His connection to the PORT GIBSON was substantial in nature but short in duration only due to its sinking.

At approximately 5:00 o'clock a.m. on March 21, 2012, C. Dardar testified that he attempted to exit his bunk, and

immediately fell to the wet deck of the PORT GIBSON that was reportedly listing to port at an angle of about 45 degrees. During evacuation from the vessel, C. Dardar maintains he injured his back and right shoulder. He was treated first at the Emergency Department of West Jefferson Medical Center; and, later, at Advanced Medical Center in Gretna, Louisiana. He received conservative medical treatment for soft tissue injuries. Following treatment on the day of the accident there was a gap in treatment. Thereafter, he received treatment from June through July 2012 at Advanced Medical Center. He returned to the same chiropractor who treated him for prior back and shoulder pain sometimes before 2012. He reports some lingering effects from the March 2012 incident to his lower back and shoulder, primarily during heavy work. He has submitted relevant unpaid medical bills amounting to $2,273.60; and further claims losing personal property during the sinking valued between $400.00 to $600.00.

While Mr. C. Dardar contends that he was unable to work for months after the March 21st sinking, he was back at work less than a month after the sinking, including work as a commercial fisherman and briefly doing welding work. He cites economic necessity for returning to work early after the sinking.

His employer, Crown Point Holdings, L.L.C. and C & J of Crown Point, L.L.C. ("Crown Point"), offered credible evidence

that other than his emergency room visit on the day of the sinking, C. Dardar never advised Crown Point that he later sought other health care.  Further credible evidence shows that he never requested maintenance.  Crown Point reasonably believed that his medical issue was promptly resolved and that he returned to his usual intermittent employment.

C. Dardar meets the minimal requirements for Jones Act seaman status.  Although it is not necessary that a seaman aid in navigation or contribute to the transportation of the vessel, a seaman must be doing the ship's work. The key to seaman status is employment-related connection to a vessel in navigation, and that the requirement that an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission captures well an important requirement of seaman status. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 357, 115 S. Ct. 2172, 2184, 132 L. Ed. 2d 314 (1995).

The essential requirements for seaman status are twofold. First, an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission. But this threshold requirement is very broad.  All who work at sea in the service of a ship are eligible for seaman status. Second, a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature. The fundamental

purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea. See 1B A. JENNER, BENEDICT ON ADMIRALTY § 11a, pp. 2-10.1 to 2-11 (7th ed. 1994) ("If it can be shown that the employee performed a significant part of his work on board the vessel on which he was injured, with at least some degree of regularity and continuity, the test for seaman status will be satisfied"). It is important to recall that the question of who is a "member of a crew," and therefore who is a "seaman," is a mixed question of law and fact. Because statutory terms are at issue, their interpretation is a question of law and it is the court's duty to define the appropriate standard. On the other hand, if reasonable persons, applying the proper legal standard, could differ as to whether the employee was a 'member of a crew,' it is a question for the fact finder. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368-69, 115 S. Ct. 2172, 2190, 132 L. Ed. 2d 314 (1995).

C. Dardar had a direct connection with the PORT GIBSON, a vessel in navigation, and his duties contributed directly to the function of that tug and the accomplishment of its mission; a

mission he was assigned to undertake with it, exposing him to perils at sea. All or most of his time was spent aboard the tug or in its direct service. His injury was sustained while engaged in maritime service. Even though the nature of the worker's activities is a factor in determining his substantial connection to the vessel, the *Chandris* Court emphasized that there is "a status-based standard" for determining Jones Act coverage. *Chandris*, 515 U.S. at 358. In other words, "it is not the employee's particular job that is determinative [of seaman status], but the employee's connection to a vessel." *Id*. at 364. Thus, even a ship repairman (which is traditional longshoreman work and is one of the enumerated occupations under the LHWCA) may qualify for seaman status if he has the requisite employment-related connection to the vessel. *Id*. at 363-64 (citing *Southwest Marine, Inc. v. Gizoni*, 502 U.S. 81, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991)). The Court revisited *Chandris* in *Harbor Tug* in 1997. *Harbor Tug Co. v. Papai*, 520 U.S. 548, 117 S.Ct. 1535 (1997). The *Harbor Tug* Court explained that the inquiry into the worker's employment-related connection to the vessel must concentrate on *whether the employee's duties take him to sea*. *Id*. at 555. This will give substance to the inquiry both as to the duration and nature of the employee's connection to the vessel and be helpful in distinguishing land-based from sea-based employees. *Id*. (emphasis added); *In re Endeavor Marine*

*Inc.*, 234 F.3d 287, 291 (5th Cir. 2000). The Fifth Circuit noted in the latter case that the *Harbor Tug* Court stated that the determination of whether the claimant went to sea was only "helpful" in determining whether there was a requisite connection to the vessel. *In re Endeavor Marine Inc.*, 234 F.3d at 291. The Circuit further stated that when read in context, the "going to sea" passage in *Harbor Tug* is a shorthand way of saying that the employee's connection to the vessel regularly exposes him "'to the perils of the sea.'" *Harbor Tug*, 520 U.S at 554-55(quoting *Chandris*, 515 U.S. at 368). For those reasons, the Circuit found it was reversible error to conclude a claimant is not a Jones Act seaman merely because their duties do not literally carry them to sea. *In re Endeavor Marine Inc.*, 234 F.3d at 292. Here, the voyage was set to occur the day after the sinking.

As correctly noted by C. Dardar in post-trial briefing, the trial evidence shows that there was sufficient reason for his employer to inspect the hull of the PORT GIBSON or at least further investigate the timber which appeared protruding from under or next to its hull. As found earlier, no such inspection or investigation was undertaken by the employer, his cousin D. Dardar – a principal owner of Crown Point. That same timber was found to be the cause of the vessel sinking on March 21st. Here, credible evidence shows that the Crown Point defendants had

22

actual or constructive notice of the hazardous timber for days
prior the sinking of its vessels, unsuccessfully tried to remove
the hazard, failed to duly inspect its vessels and failed to
duly warn others about the hazard prior to the sinking.  C.
Dardar further correctly states that the evidence shows that his
injuries were a direct result of the ruptured hull of the PORT
GIBSON and a probable consequence of that condition.

Except for the maintenance claims that he failed to prove,
C. Dardar prevails on his remaining Jones Act negligence and
vessel unseaworthiness claims against Crown Point defendants,
the sole parties at fault for the sinking and his damages.
Claims by him and Crown Point (for indemnity, comparative fault
and/or contribution) against NATURES WAY, along with Crown Point
claims for comparative fault against C. Dardar are dismissed for
earlier stated reasons.

As damages, credible evidence shows C. Dardar's entitlement
to $2,273.60 for medical bills; $400.00 for lost personal
property; $2,000.00 for lost earnings; $2,000.00 for general
damages; plus prejudgment interest on those awards until paid;
plus costs.  Having stipulated to its fault for the damages to
the two small uninsured work barges/flats, NATURES WAY will be
cast in judgment to pay $20,900.00 to J. Dardar, plus
prejudgment interest on that award until paid, plus costs
associated only with that recovery.  Finally, all claims by

plaintiffs against NATURES WAY defendants arising from and including the sinking of the PORT GIBSON and the Dredge are dismissed for reasons stated above.

New Orleans, Louisiana, this 11th day of June, 2015.


_____
UNITED STATES DISTRICT JUDGE